UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

        v.                                    Case No. 23-CR-109

EDLANDO M. WATSON,

        Defendant.

---

## ORDER DENYING MOTION TO DISMISS INDICTMENT

---

Defendant Edlando Watson is charged in this court with possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). Watson is a felon because he was convicted of Possession with Intent to Distribute Cocaine Base and Possession of a Firearm by a Drug User in the United States District Court for the Western District of Wisconsin in 2013. Watson is also currently facing charges in the Circuit Court for Dane County for First-Degree Recklessly Endangering Safety for allegedly firing shots at a vehicle occupied by an adult male driver, three young children, and the children's mother. This case is currently before the court on Watson's motion to dismiss the indictment on the ground that § 922(g)(1) is unconstitutional under the Second Amendment as applied to him. For the reasons that follow and consistent with almost all of the approximately 200 federal district courts to consider the issue, the court concludes that § 922(g)(1) is not unconstitutional and Watson's motion should therefore be denied.

The Second Amendment provides: "A well regulated militia, being essential to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In the last fifteen years, the Supreme Court has decided three cases that bear on the issue presented in this

case. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Court held that a District of Columbia prohibition on the possession of a handgun in one's own home violates the operative clause of this Amendment, which recognizes the right of an individual to possess arms that are in common use for defensive purposes. The Court also recognized, however, that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. Although the Court in *Heller* did not undertake an exhaustive historical analysis of the full scope of the Second Amendment, it expressly noted that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27.

In *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court held that the Second Amendment applied to state and local governments through the Fourteenth Amendment and thus rendered invalid a ban on the possession of handguns by the City of Chicago. The Court reiterated its holding in *Heller* that "individual self-defense is 'the central component' of the Second Amendment right." *Id.* at 767 (quoting *Heller*, 554 U.S. at 599). *McDonald* also repeated the Court's assurance in *Heller* that the right protected by the Second Amendment was not unlimited and that its holding did not cast doubt on longstanding regulatory measures, such as those prohibiting the possession of firearms by felons. *Id.* at 786. In essence, both *Heller* and *McDonald* "established that the Second Amendment 'protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home.'" *Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023) (quoting *McDonald*, 561 U.S. at 780). Both cases also made clear, however, that the right was not unlimited and offered as an example of commonly accepted limitations the "longstanding prohibitions on the possession of firearms by felons and the mentally

2

ill." *Heller*, 554 U.S. at 626; *see also McDonald*, 561 U.S. at 786. Indeed, in *Heller*, the Court characterized such limitations as "presumptively lawful regulatory measures." 554 at 627 n.26.

Finally, in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2122 (2022), the Court struck down a New York law that required one who wanted to carry a firearm outside of his home to show "proper cause" to do so and held that "ordinary, law-abiding citizens have a Second Amendment right to carry handguns publicly for their self-defense." Again, the Court explicitly noted that the right to carry a firearm was not unlimited. *Id.* at 2133. And two members of the majority expressly noted *Heller*'s specific reference to prohibitions on the possession of firearms by felons as one of the presumptively lawful limitations on which the majority opinion is not intended to cast doubt. *Id.* at 2162 (Kavanaugh, J., with Roberts, C.J., concurring). A third emphasized that nothing said in *Bruen* "disturbed anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns." *Id.* at 2157 (Alito, J., concurring).

Walton's claim in this case is that *Bruen* compels the conclusion that laws that prohibit felons, at least non-violent felons, from possessing firearms, like § 922(g)(1), are invalid. It is not the specific holding of *Bruen* that compels such a conclusion, he argues, but rather the framework that the Court adopted for deciding such questions. Application of that framework to § 922(g)(1), he contends, mandates the conclusion that the long-standing prohibition of possession of firearms by persons convicted of a felony is unconstitutional at least as applied to him under the facts of this case. In *Atkinson*, a majority of a three-judge panel of the Seventh Circuit vacated the district court's decision denying a similar motion and remanded the case to allow the district court to undertake the analysis required under the *Bruen* framework in the first instance. *See* 70 F.4th at 1020.

3

Prior to *Bruen*, the lower courts had adopted a two-step test for Second Amendment challenges. "The threshold question is whether the regulated activity falls within the scope of the Second Amendment." *Ezell v. City of Chicago*, 846 F.3d 888, 892 (7th Cir. 2017). If not, "then the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review." *Id.* (internal quote omitted). If, however, "the historical evidence is inconclusive or suggests that the regulated activity is not categorically unprotected, then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Id.* At that point, the court conducted a "means-ends" analysis that required the court to "evaluate the regulatory means the government has chosen and the public-benefits end it seeks to achieve." *Id*.

In *Bruen*, the Court declined to adopt the lower court's two-part approach and expressly rejected the "means-end" inquiry those courts had fashioned. Instead, the Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 142 S. Ct. at 2126. To justify a regulation that restricts such conduct, "the government may not simply posit that the regulation promotes an important government interest." *Id.* "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (internal quotations omitted).

The Court's rejection of the "means-end" analysis reflects the majority's view that the basic right to bear arms could not be dependent on legislative or judicial sufferance. In other words, the mere fact that firearms have the capacity to harm people and the government has a strong interest

4

in protecting people from harm cannot justify depriving law-abiding citizens of the right to bear arms. As the Court noted in *Heller*, "[a] constitutional guarantee subject to future judges' assessment of its usefulness is no constitutional guarantee at all." 554 U.S. at 634. Instead, the Court concluded that the Second Amendment's text and the historical understanding surrounding it constitute the true measure of the contours of the right the constitution was intended to protect.

*Bruen* set forth two approaches for assessing this historical understanding. The first, which the Court described as "fairly straightforward," involved instances "when a challenged regulation addresses a general societal problem that has persisted since the 18th century." 142 S. Ct. at 2131. "[T]he lack of a distinctly similar historical regulation addressing that problem," the Court noted, "is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* "Likewise," the Court explained, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.*

The second way in which the required historical analysis was to be performed involved a "more nuanced approach." *Id.* at 2132. A more nuanced approach was needed, the Court explained, due to the "unprecedented societal concerns" that have arisen or the "dramatic technological changes" that have occurred since the ratification of the Second and Fourteenth Amendments. *Id.* To determine whether a distinctly modern firearms regulation was constitutional, a court was required to reason by analogy from relevantly similar regulations that were in existence at the relevant time. *Id.* And although the *Bruen* Court did not provide an "exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it noted that "*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33.

5

"[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified," the Court concluded, "are central considerations when engaging in an analogical inquiry." *Id.* at 2133 (internal quotations omitted). The Court cautioned, however, that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* Explaining further, the Court noted:

> On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond v. Robinson*, 9 F.4th 217, 226 (CA3 2021). On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.*

Watson contends that as an American citizen, he falls within the class of persons whose rights the Second Amendment protects. "Because the plain text of the Second Amendment covers the conduct criminalized by Section 922(g)(1)," he argues, "the burden shifts to the government to 'justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" Def.'s Reply Br. at 5, Dkt. No. 21 (quoting *Bruen*, 142 S. Ct. at 2130; *Atkinson*, 70 F.4th at 1020). "The government cannot meet that burden," he concludes, "because the historical record demonstrates that there is no longstanding tradition of preventing non-violent felons from possessing guns." *Id.* at 5–6.

As noted above, Watson's prior felony convictions were for Possession with Intent to Distribute Cocaine Base and Possession of a Firearm by a Prohibited Person. It is true that the government has not offered historic evidence of laws prohibiting persons convicted of drug felonies from possessing guns, but that is hardly surprising. As the Ninth Circuit recently observed, "[i]llegal drug trafficking is a largely modern crime . . . animated by unprecedented

6

contemporary concerns regarding drug abuse . . . ." *United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023). As *Bruen* expressly recognized, cases implicating unprecedented societal concerns may require "a more nuanced approach." *Id.* at 1130 (citing *Bruen*, 142 S. Ct. at 2132). "Like burglary or robbery," the *Alaniz* court continued, "drug trafficking plainly poses substantial risks of confrontation that can lead to immediate violence." *Id.* For these reasons, the court rejected the defendant's argument that *Bruen* rendered the two-level guideline enhancement under U.S.S.G. § 2D1.1(b)(1) for possession of a firearm during a drug trafficking offense unconstitutional.

The Eighth Circuit recently rejected a challenge almost identical to Watson's in *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023). The defendant in *Jackson*, like Watson, was previously convicted of a drug trafficking felony. In rejecting the defendant's argument that § 922(g)(1) was unconstitutional as applied to him, the court noted that "[h]istory shows that the right to keep and bear arms was subject to restrictions that included prohibitions on possession of firearms by certain groups of people." *Id.* at 502. The court observed that there were two schools of thought as to the basis of such regulations:

> A panel of the Third Circuit recently surveyed the history in light of *Bruen* and concluded that legislatures have longstanding authority and discretion to disarm citizens who are not "law-abiding"—i.e., those who are "unwilling to obey the government and its laws, whether or not they had demonstrated a propensity for violence." *Range v. Att'y Gen.*, 53 F.4th 262, 269 (3d Cir. 2022) (per curiam), *vacated, reh'g en banc granted*, 56 F.4th 992 (3d Cir. 2023). Jackson contends that a legislature's traditional authority is narrower and limited to prohibiting possession of firearms by those who are deemed more dangerous than a typical law-abiding citizen.

*Id.* While it recognized that "the better interpretation of the history may be debatable," the court concluded that "either reading supports the constitutionality of § 922(g)(1) as applied to Jackson

and other convicted felons, because the law 'is consistent with the Nation's historical tradition of firearm regulation.'" *Id.* (quoting *Bruen*, 142 S. Ct. at 2130).

To be sure, the historical analogues cited by the court in *Jackson* included categorical prohibitions that would be considered "impermissible today under other constitutional provisions." *Id.* at 503. These included prohibitions directed at Native Americans, religious minorities, and people who refused to declare an oath of loyalty. *Id.* at 502–03. The court nevertheless found the analogues "relevant here in determining the historical understanding of the right to keep and bear arms." *Id.* The *Jackson* court noted that based on the same historical prohibitions, the Third Circuit panel in *Range* had "concluded that legislatures traditionally possessed discretion to disqualify categories of people from possessing firearms to address a threat purportedly posed by these people 'to an orderly society and compliance with its legal norms,' not merely to address a person's demonstrated propensity for violence." *Id.* (quoting *Range*, 53 F.4th at 281–82). The *Jackson* court found this conclusion "bolstered by the Supreme Court's repeated statements in *Bruen* that the Second Amendment protects the right of a 'law-abiding citizen' to keep and bear arms." *Id.* (citing *Bruen*, 142 S. Ct. at 2122, 2125, 2131, 2133–34, 2135 n.8, 2138, 2150, 2156).

If, on the other hand, the historical regulation of firearms is viewed not as a way of disarming citizens who are deemed to be not law-abiding, but instead as an effort to address a risk of dangerousness, the *Jackson* court concluded that the prohibition on possession by convicted felons still passes constitutional muster under historical analysis." *Id.* at 504. For "[n]ot all persons disarmed under historical precedents—not all Protestants or Catholics in England, not all Native Americans, not all Catholics in Maryland, not all early Americans who declined to swear an oath of loyalty—were violent or dangerous persons." *Id.* This suggests that even if the dangerousness of the person prohibited was the motivating consideration for the prohibition, there was "no

8

requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons." *Id.* In sum, the *Jackson* court concluded:

> legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms. Whether those actions are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons. Consistent with the Supreme Court's assurances that recent decisions on the Second Amendment cast no doubt on the constitutionality of laws prohibiting the possession of firearms by felons, we conclude that the statute is constitutional as applied to Jackson.

*Id.* at 505–06.

The *Jackson* court also cited as support for this conclusion the D.C. Circuit's pre-*Bruen* decision in *Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019). In *Medina*, the court began its analysis with the understanding of a felony crime as it would have been understood at the Founding. Citing *Blackstone*, the court noted that "felonies were so connected with capital punishment that it was 'hard to separate them.'" *Id.* at 158 (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 95 (Harper ed. 1854)). Although the *Medina* court acknowledged that "the penalties for many felony crimes quickly became less severe in the decades following American independence," it observed that "felonies were—and remain—the most serious category of crime deemed by the legislature to reflect 'grave misjudgment and maladjustment.'" *Id.* (quoting *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017)). Given that perspective, the *Medina* court reasoned, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Id.* "A prohibition on firearm ownership, like these other disabilities [forfeiture of right to serve on jury or vote]," the court observed, "is a reasonable consequence of

9

a felony conviction that the legislature is entitled to impose without undertaking the painstaking case-by-case assessment of a felon's potential rehabilitation." *Id.* at 160–61.

This court finds *Jackson* and *Medina* persuasive. It is true, as Watson contends, that the government has not established a longstanding tradition of prohibiting felons, *per se*, from possessing firearms. But *Bruen* requires only historical analogues, not "historical twins." 142 S. Ct. at 2133. In demanding that examples of felon-in-possession laws be on the books when the Second Amendment was ratified, Watson is ignoring *Bruen*'s caution that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." 142 S. Ct. at 2133. The same mistake seems to permeate the court's decision in *United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309 (S.D. Miss. June 28, 2023), the primary district court case on which Watson relies.

Modern laws prohibiting felons from possessing firearms are analogous but far more reasonable and just than the early English and revolutionary period laws that prohibited religious minorities or Native Americans from doing so. The modern laws also reflect the societal changes that have occurred since those earlier times, most notably, the reduction in the severity of penalties for most felonies, including the almost complete elimination of the death penalty; the degree to which firearms are no longer, for many, an essential tool for putting food on the table; and the technological improvements in commonly available firearms, making them far more efficient and dangerous than at the time the Second Amendment was ratified. Given this changed world, laws prohibiting firearm possession by felons are fully consistent with the historical understanding of the Second Amendment. *Bruen*, 142 S. Ct. at 2132 ("Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated.").

Watson contends that regarding the prohibition of firearms by felons as relevantly similar to the historical tradition permitting legislatures to take firearms away from people who were then regarded as dangerous is overbroad. In support of this argument, Watson quotes an observation the Fifth Circuit recently made in invalidating a conviction under 18 U.S.C. § 922(g)(3), which prohibits possession of firearms by persons who are unlawful users of or addicted to controlled substances. In the words of the court,

> any ability to implement a "dangerousness principle" is fenced in by at least two strictures in the applicable caselaw. On the one hand, the legislature cannot have unchecked power to designate a group of persons as "dangerous" and thereby disarm them. Congress could claim that immigrants, the indigent, or the politically unpopular were presumptively "dangerous" and eliminate their Second Amendment rights without judicial review. That would have no true limiting principle," and would render the Second Amendment a dead letter.

*United States v. Daniels*, 77 F.4th 337, 353 (5th Cir. 2023) (internal citation omitted).

This argument ignores the fundamental difference between individuals who have willfully chosen to commit "the most serious category of crime deemed by the legislature to reflect grave misjudgment and maladjustment," *Medina*, 913 F.3d at 158, and those who have not. The limiting principle here, as in most decisions courts are called upon to make, is the recognition of essential differences in the classes or categories to which the law may be applied. To treat immigrants, the indigent, or the politically unpopular as if they were people who had willfully chosen to engage in serious violations of the law would be arbitrary and capricious. Recognizing as much does not render the Second Amendment a dead letter.

As the government's list of post-*Bruen* district court decisions (Ex. A, Dkt. No. 17-1) demonstrates, this court's conclusion is not an isolated one. Nearly every district court that has addressed the constitutionality of § 922(g)(1) since *Bruen*—in approximately 200 separate rulings—has concluded that the statute remains constitutional. More recent decisions from within

11

this circuit offer thorough discussions of the same issue and provide even more support. *See, e.g.*, *United States v. Agee*, No.1:21-CR-00350-1, 2023 WL 6443924 (N.D. Ill. Oct. 3, 2023); *United States v. Gates*, No 1:22-CR-00397-1, 2023 WL 5748362 (N.D. Ill. Sept. 6, 2023).

Finally, even if the court were to conclude that § 922(g)(1) was overbroad to the extent that it applies to all felons, Watson's as applied challenge would fail. Although a divided Third Circuit, sitting *en banc*, vacated the previous panel decision referenced above in *Range v. Gardner* and held § 922(g)(1) unconstitutional as applied to the plaintiff in that case, the court emphasized that its decision was "a narrow one," and applied "only" to the plaintiff in that case whose prior 1995 conviction was for violating a Pennsylvania statute criminalizing the making of a false statement to obtain food stamps. 69 F.4th 96, 106 (3d Cir. 2023). The violation was classified as a misdemeanor, even though it was punishable by up to five years imprisonment. *Id.* at 98. This limited holding provides no support for Watson's as applied argument here. His 2013 conviction for Possession of Cocaine Base with Intent to Distribute, for which he was sentenced to twenty-seven months in federal prison, is more serious and more recent than Range's 1995 conviction for the misdemeanor charge of making false statement on a food stamp application, for which he received straight probation. Given the well-recognized connection between drug trafficking and guns, *see United States v. Ramirez*, 45 F.3d 1096, 1103 (7th Cir. 1995) ("this court has recognized that weapons are tools of the narcotics trade"), application of § 922(g)(1)'s prohibition in this case is constitutional as applied to Watson even if it may not be sustained in other applications.

Watson's Motion to Dismiss the Indictment on Second Amendment Grounds (Dkt. No. 11) is therefore denied.

**SO ORDERED** at Green Bay, Wisconsin this <u>11th</u> day of October, 2023.

s/ William C. Griesbach
William C. Griesbach
United States District Judge
